**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
WEST PALM BEACH DIVISION

DARRYL ASHMORE,

     Plaintiff,

                                     Case No.: 9:16-cv-81710-KAM

v.

NFL PLAYER DISABILITY AND
NEUROCOGNITIVE BENEFIT PLAN,

     Defendant.

_____/

**PLAINTIFF'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, Darryl Ashmore ("Mr. Ashmore"), pursuant to Fed. R. Civ. P. 56, moves for summary judgment against Defendant, NFL Player Disability and Neurocognitive Plan (the "Plan" or "Defendant"), and states:

**I.     BACKGROUND**

Mr. Ashmore played offensive tackle in the National Football League ("NFL") for eleven seasons from 1992-2002. Throughout his playing career, Mr. Ashmore endured physical punishment. Not surprisingly, he now suffers from a constellation of medical conditions – such as chronic pain and cognitive impairments – that impair his ability to engage in any occupation. Accordingly, Mr. Ashmore submitted an application for total and permanent ("T&P") disability benefits under the NFL Player Disability and Neurocognitive Plan (the "Plan"), a welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

Upon receipt of Mr. Ashmore's application, Defendant required he submit to medical examinations with physicians selected by Defendant. As will be seen, Mr. Ashmore consistently affirmed his willingness to attend the examinations, but sought to obtain reasonable

accommodations amid concerns about the exacerbation of his conditions. Despite being led to believe Defendant was reviewing his request for accommodations, Mr. Ashmore was ambushed with a denial of his application for T&P benefits. The <u>sole</u> reason given by Defendant was that Mr. Ashmore did not attend medical examinations and failed to provide sufficient notice as required by the Plan. Although Mr. Ashmore's application was accompanied by medical records, as is customary in disability benefits claims, Defendant failed to review those records to determine whether the medical evidence supported a finding of T&P disability.

Exercising his statutory right to a "full and fair review" under ERISA, Mr. Ashmore appealed the denial of his application. In addition to presenting substantial, if not overwhelming, medical evidence of T&P disability, Mr. Ashmore clearly set forth facts showing he had been blindsided while awaiting a response on his request for accommodations. Rather than conduct a full and fair review, Defendant simply denied Mr. Ashmore's appeal for the same given reason. Incredibly, Defendant again refused to review any of the medical records submitted along with his appeal. Mr. Ashmore brought this suit pursuant to ERISA, 29 U.S.C. § 1001, *et seq.*, to recover disability benefits Defendant has wrongly withheld from him.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

Unless otherwise specified, the following derive from documents produced by Defendant as its "Administrative Record" with the name "Ashmore" followed by stamped numbers:

1.      Darryl Ashmore was a professional football player in the National Football League ("NFL") for 11 seasons from 1992-2002. [Ashmore 345]

2.      As a former player in the NFL, Mr. Ashmore was an eligible participant of the Plan at all times material to this action. [DE 8, *Def's Ans.*, at ¶ 6]

**<u>The NFL Player Disability and Neurocognitive Benefit Plan</u>**

3.      The Plan was created "to provide disability benefits to certain Players who become totally and permanently disabled." [Ashmore 6]

4.      An applicant is deemed to be T&P disabled if the Disability Board ("Board") or the Disability Initial Claims Committee ("Committee") finds (1) that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, and (2) that such condition is permanent. [DE 8, *Def's Ans.*, at ¶ 7]

5.      Upon review of an application or appeal for T&P disability benefits, the Board or Committee may require the player to submit to an examination by a neutral physician or physicians selected by the Board or the Committee. [Ashmore 12]

6.      If a Player fails to attend a scheduled examination, his application for T&P disability benefits will be denied, unless the Player provided at least two business days advanced notice that he was unable to attend. [Ashmore 12]

7.      The minimum monthly benefit depends on the category awarded. Effective January 1, 2016, minimum amounts are as follows: (i) $22,084 per month for Active Football; (ii) $13,750 per month for Active Nonfootball; (iii) $11,250 per month for Inactive A; and (iv) $5,000 per month for Inactive B. [Ashmore 15]

8.      The Committee is responsible for the initial determination of any and all disability benefits under the Plan. [Ashmore 42]

9.      The Board is the Plan's named fiduciary, and it issues final decisions on all claims for benefits. [DE 29, *Def.'s Resp. to Pl.'s Mot. To Compel*, Pg. 2]

10.     The Board's review of an appeal will take into account all available information, regardless of whether that information was presented or available to the Committee. [Ashmore 54]

11.     The Plan stipulates "[t]he Disability Board and the Disability Initial Claims Committee will discharge their duties with respect to the Plan solely in the interest of the Player and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." [Ashmore 43-44]

**Mr. Ashmore's Application for T&P Benefits**

12.     Mr. Ashmore submitted an application for T&P disability benefits on September 26, 2015. [Ashmore 73-75]

13.     The NFL Player Benefits Office ("Plan Office") gathers and prepares all pertinent application-related material for presentation to and consideration by the Committee. [DE 29, *Def.'s Resp. to Pl.'s Mot. To Compel*, Pg. 2]

14.     Mr. Ashmore's application was supported by records/reports from two orthopedic surgeons, Drs. George Canizares and Joseph Purita; a psychotherapist, Dr. Claude S. Munday; three neurologists Drs. Richard Gravina, Kenneth C. Nudleman, Adam DiDio; and two internists, Drs. Charles R. Johnson and Prakash Jay. [Ashmore 79-80]

15.     From a physical standpoint, the records note Mr. Ashmore suffers from several disc bulges in the cervical and lumbar spine, cervical radiculopathy, lumbar stenosis, leukopenia, orthopedic impairments in the knees and shoulders, posttraumatic headaches, facial palsy, uncontrolled hypertension, and hypertensive heart disease. [Ashmore 114-314]

16.     From a cognitive standpoint, the records note potential developing dementia, difficulty maintaining concentration, and memory impairment. [Ashmore 114-314]

**Mr. Ashmore's Requests for Accommodations and Defendant's Denial of his Application**

17.     By letters dated October 9, 2015, Mr. Ashmore was informed that he was to attend

three medical examinations, scheduled as follows:

- Neurological evaluation with Eric Brahin, M.D., on October 16, 2015 in San Antonio, Texas.
- Orthopedic evaluation with Chaim Arlosoroff, M.D., on October 20, 2015 in North Palm Beach, Florida
- Neuropsychological evaluation with Rodney Vanderploeg, PhD., on October 22, 2015 in Tampa, Florida.

[Ashmore 84 – 89]

18.     Mr. Ashmore is a resident of Palm Beach County, Florida. [DE 1, *Compl.*, at ¶ 2]

19.     By letter dated October 13, 2015, Mr. Ashmore expressed concern that his "medical condition will be exacerbated by long-distance travel," and thus requested "that any examination be scheduled at a location within 45 minutes travel by car of his residence." Mr. Ashmore affirmed that he "is ready and willing to submit to the examinations." [Ashmore 91-92]

20.     By email dated October 14, 2015, Ms. Elise Richard, benefit coordinator for the Plan Office, notified Mr. Ashmore that she "can reschedule these evaluations, but they will not be any closer." [Ex. E - Ashmore-SUPP  7][1]

21.     By letter dated October 14, 2015, Mr. Ashmore explained that "undergoing medical examinations are fine with [him]," but would need to "confirm with his physician as to whether the current examination locations pose a concern to [his] well-being." [Ashmore 96]

22.     On October 15, 2015, Mr. Ashmore submitted a letter drafted by Dr. Frank Conidi in which the doctor opined "chronic back issues and radicular symptoms preclude [Mr. Ashmore] from flying." Dr. Conidi recommended Mr. Ashmore "be evaluated by physicians based out of Florida" and within a "one hour drive of his home." [Ashmore 100-101]

23.     By letters dated October 16, 2015, Mr. Ashmore was informed that the

---

[1] Documents labeled "Ashmore-SUPP" were generated during the review of Mr. Ashmore's application and/or appeal and produced pursuant to Judge Matthewman's Order (DE 25).

examinations had been rescheduled to take place as follows:

- Neuropsychological evaluation with Stephen Macciocchi, PhD., on November 03, 2015, in Atlanta, Georgia.
- Neurological evaluation with Barry McCasland, M.D., on November 02, 2015, in Atlanta, Georgia.
- Orthopedic evaluation with David Apple, M.D., on November 04, 2015, in Atlanta, Georgia.

[Ashmore 103-108]

24.     At Ms. Richard's suggestion, Mr. Ashmore submitted a letter on October 27, 2015, in which he asserted that his concerns had not been addressed and asked that Ms. Richard "present this letter to the committee." Mr. Ashmore reiterated he "is willing to submit to all examinations," but asked that he be granted the following accommodations. He requested that:

- the examinations be broken-up into two separate trips to Atlanta;
- the neuropsychological evaluation would take place over two to three days;
- he be assigned a seat with extra leg room; and
- he be provided car service to and from both airports.

[Ashmore 110-111]

25.     At 8:46 a.m. on October 28, 2015, Ms. Richard emailed Mr. Ashmore and informed him the neuropsychologist could not break up the neuropsychological examination and, thus, the three examinations remained as scheduled. [Ex. D - Ashmore-PROD 38][2]

26.     At 9:03 a.m. on October 28, 2015, Mr. Ashmore emailed Ms. Richard asking "[d]id you present my letter to the committee," as he wished to "hear from the committee or whoever has authority about accommodations." [Ex. D - Ashmore-PROD 38]

27.     At 2:47 p.m. on October 28, 2015, Ms. Richard responded to Mr. Ashmore by stating she "will be presenting everything to the Committee." [Ex. D - Ashmore-PROD 38]

---

[2] Documents labeled "Ashmore-PROD were generated during the review of Ashmore's application and/or appeal for T&P benefits and produced during discovery in this litigation.

28.     Mr. Ashmore's application for T&P benefits was presented to the Committee on October 29, 2015.  A checklist provided to the Committee indicated that Mr. Ashmore did not attend the examinations scheduled to take place on November 2-4. [Ashmore 345]

29.     In a letter dated November 03, 2015, the Committee informed Mr. Ashmore that his application for T&P disability was denied. The sole reason given in its denial letter was that he "failed to submit to a physical examination and failed to provide sufficient notice." [Ashmore 369]

30.     Emails omitted from the record compiled only by Defendant, but uncovered through discovery, reveal the following:

- At 6:49 a.m. on October 28, 2015, Mr. Paul Scott, Director of Disability Benefits, asserted that he had "no problem" accommodating Mr. Ashmore's requests if Dr. Macciocchi could accommodate the scheduling over two days.

- At 8:08 a.m. on October 28, 2015, Ms. Richard emailed Dr. Macciocchi asking whether he could accommodate Mr. Ashmore's request.

- At 8:09 a.m. on October 28, 2015, Ms. Richard asked Mr. Scott whether she should reach out to Dr. Vanderploeg (in Tampa, Florida) if "Macciocchi can't since he is closer."

- At 8:15 a.m. on October 28, 2015, Mr. Scott replied to Ms. Richard and stated he would try to "stick with Macciocchi."

- At 8:30 a.m. on October 28, 2015, Dr. Macciocchi replied and stated he was booked the following week and, thus, could not break up the testing into two days.

- At 8:46 a.m. on October 28, 2015, Ms. Richard emailed Mr. Ashmore and informed him the doctor could not break up the examination and, thus, the three examinations remained as scheduled.

- At 9:03 a.m., on October 28, 2015, Mr. Ashmore emailed Ms. Richard asking "[d]id you present my letter to the committee so Mr. Ashmore's situation can be given proper consideration," as he wished to "hear from the committee or whoever has authority about accommodations for Ashmore."

- At 9:03 a.m. on October 28, 2015, Ms. Richard forwarded Mr. Ashmore's email to

Mr. Scott and wrote "Well there you go . . . "

- At 9:06 a.m. on October 28, 2015, Mr. Scott replied to Ms. Richard and stated, "[g]o ahead and present him and he will get a formal 'you got to go' from the DIIC."

- In emails spanning from 9:10 a.m. to 9:13 a.m. on October 28, 2015, Ms. Richard cancelled all scheduled medical examinations.

- At 2:47 p.m. on October 28, 2015, Ms. Richard assured Mr. Ashmore that she "will be presenting everything to the committee."

[Ex. D - Ashmore-PROD 1 – Ashmore-PROD 42]

**Mr. Ashmore's Appeal**

31.     Via letter dated April 29, 2016, Mr. Ashmore submitted his appeal to the Board explaining the Committee's denial of his claim for T&P disability benefits. [Ashmore 372]

32.     In the appeal, Mr. Ashmore stated that he was blindsided with a denial "a mere six days after receiving Ms. Richard's assurance" that she would be "presenting everything to the Committee." [Ashmore 374]

33.     In the appeal, Mr. Ashmore stated that the "Committee failed to make a determination as to whether Mr. Ashmore was, in fact, disabled." [Ashmore 374]

34.     In the appeal, Mr. Ashmore asserted that the record provided by Defendant omitted all email correspondences between Mr. Ashmore and the Plan Office concerning his request for accommodations. These emails were enclosed with Mr. Ashmore's appeal. [Ashmore 373]

35.     Mr. Ashmore's appeal was supported by, among other things: (1) treatment notes from Dr. Joseph Purita; (2) a report completed Dr. Frank Conidi, along with treatment notes; (3) treatment notes from Dr. Marc Matarazzo; (3) a psychological report completed by Dr. Edwardo Williams and Laura Hopper; (4) a letter from Dr. David Rudnick, along with treatment notes; and, (5) treatment notes from Dr. Gary Richman. [Ashmore 372-380]

36.     The treatment notes from Dr. Purita document severe back and knee pain. MRIs

8

ordered by Dr. Purita revealed disc bulges in C2-3, C3-4, C4-5, C5-6, C6-7, L4-5, and a posterior disc herniation on L5-S1 impinging on the anterior thecal sac. Dr. Purita diagnosed Mr. Ashmore with multiple herniated discs and ordered an epidural steroid injection. [Ashmore 441-455]

37.     In his report, Dr. Conidi concluded that "as a result of both his cervical and lumbar pain with associated radicular symptoms, Mr. Ashmore will have significant difficulties participating in any type of consistent and gainful employment, even in a sedentary type of environment, as the prolonged sitting will worsen the aforementioned symptoms." Further, "Mr. Ashmore's memory issues and chronic migraine headaches are severe enough that I do not see him being able to hold down any continuous and gainful occupation." [Ashmore 417-419]

38.     The psychological evaluation report completed by Drs. Hopper and Williams showed that "performance in all areas was below what would be expected." His "processing speed is considered a significant weakness," his "auditory memory was significantly impaired," his "verbal fluency is poor," and he has "difficulty with cognitive flexibility, shifting problem-solving strategies in response to feedback, planning, and self-regulation." He was diagnosed with "major neurocognitive disorder." [Ashmore 420-430]

39.     The records from Dr. Matarazzo note bilateral knee pain, numbness, weakness, with such symptoms being "made worse by standing, walking, lifting, twisting, bending, stairs, exercise, squatting, kneeling, sitting and lying in bed." [Ashmore 431-439]

40.     In a letter dated February 20, 2016, Dr. David Rudnick noted "chronic neck pain, right cervical radiculopathy, bilateral shoulder girdle pain, low back pain and bilateral knee pain," and a "steady decline in [his] tolerance to physical activity and ADL's."[3] [Ashmore 440]

41.     Records from Dr. Richman note bilateral low back pain, bilateral knee pain

---

[3] ADL is a common abbreviation for "Activities of Daily Living."

radiating down the right leg to below the knee, and restricted range of motion. Dr. Richman diagnosed unilateral primary osteoarthritis in both knees. [Ashmore 499-520]

42.     By letter dated July 13, 2016, Mr. Ashmore submitted additional medical documentation in further support of his disability. Included with the letter was: (1) an MRI of the Lumbar Spine dated 7/14/2015; (2) an MRI of the Cervical Spine dated 7/14/2015; (3) an MRI of the Left Knee dated 4/11/2016; (4) an MRI of the Right Knee dated 4/11/2016; (5) an MRI of the Brain with DTI dated 4/28/2016; and (6) an Independent Neurological Evaluation, Electroencephalogram Interpretation, and a QEEG Interpretation all completed by Dr. J. Lucas Koberda and all dated 5/31/2016. [Ashmore 597-598]

43.     The MRI of the brain with contrast and DTI revealed "abnormal decreased white matter FA within the right anterior corona radiata region." The report explained, "decreased white matter FA on DTI has been shown to proportionately correlate with cognitive deficits and poor clinical outcome in traumatic brain injury patients." [Ashmore 607]

44.     The Independent Neurological Evaluation noted a "history of cognitive decline as well as some overlapping depression, anxiety and behavioral problems," and concluded he most likely meets "criteria of impairment related to prior multiple injuries and resulting in cognitive dysfunction and overlapping behavioral problems." [Ashmore 609-611]

45.     The QEEG Interpretation showed "a significant elevation of fontal [sic], central, and occipital beta power, indicative of regional brain dysfunction (encephalopathy) likely related to frequent headaches and possibly overlapping anxiety." [Ashmore 612-613]

46.     By letter dated July 21, 2016, Mr. Ashmore submitted a Comprehensive Rehabilitation Evaluation completed by Dr. Craig Lichtblau. [Ashmore 618-619]

47.     The Comprehensive Rehabilitation Evaluation concluded that "Mr. Ashmore does

not have functional capacity to work 4 hours per day on an uninterrupted basis at this time." Furthermore, Mr. Ashmore "will be unable to maintain gainful employment in the competitive open labor market or in a sheltered environment with a benevolent employer, sedentary to acute, intermittent exacerbations of chronic pain." [Ashmore 620-789]

48.     By letter dated July 28, 2016, Mr. Ashmore submitted an updated independent neurological evaluation report completed by Dr. J. Lucas Koberda, along with an updated and signed psychological report completed by Dr. Laura Hopper.[4] [Ex. F]

49.     By letter dated August 24, 2016, Mr. Ashmore submitted affidavits from Michelle Ashmore (wife) and Frank Boudreaux (friend), as well as a clinical dementia rating report completed by Sammantha Barker, L.P.N.[5] [Ex. G]

**The Disability Board's Appeal Denial**

50.     By letter dated August 24, 2016, Mr. Ashmore was informed that the Disability Board had considered his appeal and affirmed the denial of T&P benefits. [Ashmore 811]

51.     The sole reason given for the denial of his appeal was that he failed "to attend three scheduled medical examination, without providing at least two business days advance notice to the NFL Player Benefits Office." [Ashmore 811]

52.     Defendant admitted its denial of Mr. Ashmore's appeal for T&P disability benefits was based upon Mr. Ashmore's failure to attend scheduled medical evaluations. [*Ex. A - Def.'s Resp. to Pl.'s Req. for Admis.*, *No. 4; Ex. B - Def.'s Resp. to Pl.'s Req. for Interrog.*, *No. 18*]

53.     A case summary prepared by Defendant for review by the Board listed all records

---

[4] Defendant refused to include these reports in the administrative record on the basis that: (1) they were duplicates and (2) submitted after Defendant's unilaterally set deadline to submit materials.
[5] Defendant refused to include these records in the administrative record on the basis that the records were submitted after the Board's decision. Of note, Mr. Ashmore's letter was submitted prior to his receipt of the denial letter.

submitted with Mr. Ashmore's application and subsequent. The summary included a statement that "the records contain no findings that Player is T&P," disabled. [Ashmore 792-793]

**General**

54.     Defendant "can approve applications for total and permanent disability benefits without conducting a medical evaluation." [*Ex. A - Def.'s Resp. to Pl.'s Req. for Admis.*, *No. 2*]

55.     Defendant admitted "it did not have Mr. Ashmore's medical records reviewed by a medical professional during the application process." [Ex. A - *Def.'s Resp. to Pl.'s Req. for Admis.*, *No. 5;* Ex. C - *Def.'s Resp. to Pl.'s Req. for Produc.*, *Nos. 8 & 20*]

56.     Defendant "has discretion to grant a player's request for accommodations related to any scheduled medical examination." [Ex. A - *Def.'s Resp. to Pl.'s Req. for Admis.*, *No. 15*]

57.     Defendant "has in the past granted a player's request for accommodations related to a scheduled medical examination." [Ex. A -*Def.'s Resp. to Pl.'s Req. for Admis.*, *No. 16*]

## III.     STANDARD OF REVIEW

### A.     Summary Judgment Standard

In most cases, a motion for summary judgment is granted when the evidence on file shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In an ERISA benefits dispute, however, "the 'standard' summary judgment considerations do not apply." *See Hert v. Prudential Ins. Co. of Am.*, 650 F. Supp. 2d 1180, 1190 (M.D. Fla. 2009). Instead, here, summary judgment is merely the conduit to bring the legal question before the district court. *See Crume v. Metro. Life Ins. Co.,* 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006).

### B.     ERISA Standard of Review

Under ERISA's civil enforcement provisions, a plan participant may bring a civil action against the plan administrator to recover wrongfully denied benefits due to him under the terms of the plan. *See* 29 U.S.C. § 1132(a)(1). ERISA, however, does not promulgate standards under which district courts must review denied benefits. *Firestone Tire & Rubber Co. v Bruch,* 489 U.S. 101, 109, 109 S. Ct. 948, 953 (1989). To fill this void, the Supreme Court has articulated a framework for judicial review, which the Eleventh Circuit has distilled into a six-part test. *Melech v. Life Ins. Co. of N. Am.,* 739 F.3d 663, 672 (11th Cir. 2014). A court reviewing a plan administrator's benefits decision should conduct the following multi-step analysis:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

Conflict of interest is one of many factors to take into account when determining whether the denial of benefits was reasonable at step three. *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195-1196 (11th Cir. 2010).

## IV.   DEFENDANT'S DENIAL OF BENEFITS WAS WRONG AND UNREASONABLE

Defendant failed to make a reasoned determination based on a diligent investigation as is required by an ERISA fiduciary. *See Capone*, 592 F.3d at 1200. Instead, Defendant acted opportunistically and in its own self-interest. To do so was unreasonable.

ERISA's purpose, embodied in ERISA § 2(b), 29 U.S.C. § 1001(b), of protecting "the interests of participants in employee benefit plans and their beneficiaries," and its fiduciary goals, expressed in ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires fiduciaries to act exclusively in the interest of the plan's participants and their beneficiaries. As a plan administrator and fiduciary with discretionary authority, Defendant is bestowed with the power to interpret and apply the terms of the Plan. But because of this power, Defendant is held to a "higher than marketplace" standard. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S. Ct. 2343, 2351, 171 L.Ed. 2d 299 (2008).

Further, ERISA insists that the Plan discharge its duties with "care, skill, prudence, and diligence." 29 U.S.C. § 1104(a)(1)(B). Thus, Defendant must engage in a "deliberate, principled reasoning process." *See Glenn v. MetLife,* 461 F.3d 660, 666 (6th Cir.2006), *aff'd Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 115 S.Ct. 2343, 171 L.Ed. 2d 299 (2008). In fact, Defendant acknowledged and embraced these statutory duties by including language in its Plan document assuring participants that "[t]he Disability Board and the Disability Initial Claims Committee will discharge their duties with respect to the Plan solely in the interest of the Player and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." [Ashmore 43-44]. That process requires Defendant to consider *all* of the evidence and information – including that supplied by the claimant – with purpose and reason. With that information in mind, Defendant then answers

14

the ultimate question of whether the evidence supports that the former player is T&P disabled – a defined term in the Plan.

Here, Defendant failed in that task. Though Defendant will, no doubt, argue that its discretionary authority demands great deference, discretion cannot save Defendant. Defendant failed to reasonably and neutrally evaluate Mr. Ashmore's application when it: (1) ambushed him with a denial of his initial application; (2) refused to correct its prior actions despite being presented the opportunity to do so with his appeal; and, (3) willfully ignored all medical evidence every step of the way.

### A. Defendant's Initial Denial was an Ambush, Not a Fair and Reasonable Determination

Mr. Ashmore was kept in the dark and led to believe his request for accommodations was being considered by the Committee. While awaiting a decision, the Committee blindsided Mr. Ashmore with a denial letter. The facts make clear the Committee jumped at the opportunity to deny Mr. Ashmore's benefits and failed to provide a fair review.

After Defendant scheduled three medical examinations in three different cities (one in another state entirely, *i.e.*, Texas) all within one week, Mr. Ashmore requested reasonable accommodations.[6] [Ashmore 84-89]. Mr. Ashmore simply requested the examinations be rescheduled closer to his residence in South Florida. [Ashmore 91-92]. Were the medical records (that Defendant did not bother to review) not satisfactory enough to Defendant to support the need for accommodations, Mr. Ashmore provided a letter from his treating physician, Dr. Frank Conidi, who advised that Mr. Ashmore is precluded from flying due to "chronic back issues and radicular

---

[6] Defendant has the "discretion to grant a player's request for accommodations related to any scheduled medical examinations," and "has in the past granted a player's request for accommodations." [*Ex. A - Def.'s Resp. to Pl.'s Req. for Admis.*, *Nos. 15 -16*].

symptoms." [Ashmore 100-101]. Dr. Conidi recommended that any evaluations take place in Florida. [Id].

Ignoring Mr. Ashmore's requests and his treating physician's recommendation, the Plan Office issued notice that the examinations had been rescheduled and would take place over a three-day period in another state; this time, Atlanta, Georgia. [Ashmore 103-108]. Again, Mr. Ashmore reached out to his contact at the Plan Office – Ms. Richards – who advised him to write a letter that she would present to the Committee for consideration. Mr. Ashmore followed her recommendation and wrote a letter requesting that: (1) the three examinations be broken up into two separate trips to Atlanta; (2) the neuropsychological evaluation take place over a period of two or three days; (3) he be assigned a seat on the aircraft with extra leg room; and, (4) he be provided car services to and from both airports with assistance carrying his luggage. [Ashmore 110-111].

Ms. Richard responded to Mr. Ashmore's letter and notified him that she would be unable to break up the neuropsychological evaluation into two days due to the doctor's full schedule. [Ex. D - Ashmore-PROD 38]. Mr. Ashmore, under the impression that the Committee would be making the decision on his accommodation requests asked via email, "[d]id you present my letter to the Committee?" [Ex. D - Ashmore-PROD 38]. Ms. Richard responded assuring Mr. Ashmore that she would "be presenting everything to the Committee." [Ex. D - Ashmore-PROD 38].

Without any further correspondence, Mr. Ashmore received a letter on November 03, 2015, informing him that his application for T&P disability benefits had been denied due to his failure to submit to a physical examination and failure to provide sufficient notice of his intention not to attend. [Ashmore 369].

The facts show that Mr. Ashmore did everything right in asking for reasonable travel accommodations. His requests were made in good faith and in the hopes of preventing a worsening

of his physical condition.[7] Mr. Ashmore knew that the required travel posed an unnecessary risk to his well-being. Mr. Ashmore's concerns were shared by his treating physician, Dr. Conidi, who strongly advised against such travel, and supported by medical records in Defendant's possession.

While Mr. Ashmore had initially requested that the examinations take place in his home state of Florida, when they were rescheduled for Atlanta, Georgia, he remained flexible. Rather than insisting on Florida examinations (which also would have been reasonable), he simply requested some accommodations for his travel to Georgia. [Ashmore 110-111]. Attempting to balance his concerns for his health with the requirements of the Plan, Mr. Ashmore maintained a meaningful dialogue with Defendant in the hopes that a reasonable resolution could be reached.

With no reason to mistrust the Plan Office and Committee, Mr. Ashmore followed their suggestions and recommendations and did everything necessary to properly request accommodations. All the while, Mr. Ashmore consistently <u>and</u> repeatedly stated he would attend the medical examinations. In fact, Mr. Ashmore overtly expressed his willingness to attend examinations in *every single* correspondence with the Committee, whether written or verbal. [Ashmore 91-92, Ashmore 96, Ashmore 110-111].

While Mr. Ashmore was extremely clear about his willingness to attend the examinations, the Plan Office was demonstrably less straightforward. The Plan Office led him to believe his requests were being reviewed by the Committee, when, in fact, it was laying the groundwork for a denial. While Mr. Ashmore was patiently awaiting a decision on his accommodations request, he was slapped with a denial letter. [Ashmore 369].

---

[7] Given Mr. Ashmore's well-documented physical impairments along with the fact that he is 6'7" tall and weighs over 300 pounds, his concerns about the effects of such travel are demonstrably valid.

Emails uncovered through discovery reveal how Defendant was truly "handling" Mr. Ashmore's request for accommodations, unbeknownst to him at the time. [Ex. D – Ashmore-PROD 1-42]. The emails show that Ms. Richard consulted with Paul Scott regarding Mr. Ashmore's requests, who advised her to present Mr. Ashmore's letter for accommodations to the Committee and he would then receive a formal "you got to go" letter. [Ed. D – Ashmore-Prod 40]. Mr. Ashmore never received such a letter. Thus, Mr. Ashmore never heard from the Committee (or "whoever is in charge of accommodations") until he was denied benefits. At no point was he informed that he was expected to attend the examinations as scheduled and with or without accommodations.

Indeed, as it turns out, he could not have. The emails show that Ms. Richard cancelled all of the examinations the morning of October 28, 2015 and never informed Mr. Ashmore. [Ex. D - Ashmore-PROD 30-35]. Instead, in an email the afternoon of October 28, 2015, Ms. Richard assured Mr. Ashmore his requests would be presented to the Committee. [Ex. D - Ashmore-PROD 38]. Evidently, Mr. Ashmore's trust in Ms. Richard was misplaced.

Ms. Richard (or anyone for that matter) did not present Mr. Ashmore's request for accommodations to the Committee as he was led to believe. Instead, his entire application was given to the Committee for a decision on whether to pay benefits and, on November 3, 2015, he received a denial letter that stated his failure to attend scheduled examinations resulted in the denial of his application. [8] [Ashmore 369]. Interestingly, the Committee meeting minutes confirm that its decision to deny Mr. Ashmore's application was made on October 29, 2015, four days prior to the first scheduled examination.  [Ashmore 359 – 367].

---

[8] In reality, the examinations Mr. Ashmore is accused of not attending were cancelled 5 days earlier.

Clearly, Ms. Richard and the Plan Office misled Mr. Ashmore, but the Committee too holds blame. The Committee had the opportunity to reach its own reasonable and informed decision when Mr. Ashmore's application was presented. Indeed, the Committee is ultimately responsible for reviewing and deciding all applications for T&P disability benefits and is expected to analyze all pertinent application-related material. [DE 29, *Def.'s Resp. to Pl.'s Mot. To Compel*, at 1]. But here, the Committee failed to do so. Instead, it turned a blind eye to the substantial medical evidence Mr. Ashmore submitted and chose to opportunistically deny Mr. Ashmore's application – all based on the false assertion that he refused to attend medical examinations.

Had the Committee acted honestly and fairly towards Mr. Ashmore, it could have easily reached the conclusion that medical records in its possession confirmed his T&P disability. Or, at the very least, having been presented all written correspondences between Mr. Ashmore and the Plan Office, the Committee could have stepped in to ensure that his requests for accommodations were properly evaluated. *At a bare minimum*, the Committee could have given Mr. Ashmore a "you got to go" letter, informing him that his requests for reasonable accommodations were denied.[9]

Declining to conduct a medical review or consider Mr. Ashmore's request for accommodations, the Committee jumped at the chance to deny Mr. Ashmore's application without a real review. Ultimately, the Committee failed to act fairly and reasonably and instead, followed the path laid by the Plan Office. By doing so, the Committee participated in, and finalized the ambush of Mr. Ashmore. To do so was a breach of its fiduciary duty under ERISA.

## B.  Defendant's Appeal Denial was a Rubber Stamp, Not a Full and Fair Review

---

[9] As suggested by Mr. Scott in an email to Ms. Richard. [Ex. D Ashmore-PROD 40]

Defendant was afforded an opportunity to correct its previous mistakes and fix the unreasonable denial of Mr. Ashmore's T&P benefits when he presented an appeal. Nevertheless, the Board decided to punt this opportunity and merely rubberstamped the Committee's denial. To do so was unreasonable.

The administrator of an ERISA plan is statutorily required to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review . . . of the decision denying the claim." 29 U.S.C. § 1133(2) (2009).[10]  In order for a review process to be "full and fair," the procedures must "provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." C.F.R. § 2560.503-1(h)(2)(ii). Indeed, the Plan itself stipulates that the "Disability Board's review of the adverse determination will take into account all available information, regardless of whether that information was presented or available to the Disability Initial Claims Committee."[11] [Ashmore 54].

Mr. Ashmore submitted an appeal on April 29, 2016. [Ashmore 372-380]. In his appeal, Mr. Ashmore set forth several arguments as to why the Committee was wrong to deny his application for benefits. First, he emphasized the injustice surrounding the Committee's unexpected denial while he awaited a decision on his requests for accommodations.[12] Second, Mr.

---

[10] The Department of Labor regulations also require that "[e]very employee benefit plan shall establish and maintain a procedure by which a claimant have a reasonable opportunity to appeal an adverse benefit determination … and which there will be a full and fair review of the claim and the adverse benefit determination." C.F.R. § 2560.503-1(h)(1).

[11] As the named fiduciary for the Plan, the Board is responsible for issuing final decisions on all applications for benefits. [DE 29, *Def.'s Resp. to Pl.'s Mot. To Compel*, at 2].

[12] Mr. Ashmore also pointed out that the record provided by Defendant was incomplete. It conveniently omitted all email correspondence between Mr. Ashmore and the Plan Office related to the scheduling and accommodation requests for the medical evaluations.

Ashmore highlighted his willingness to submit to any examinations. Third, he submitted ample amounts of <u>additional</u> medical documentation confirming his T&P disability.

Mr. Ashmore clearly explained what had transpired in his appeal and implored the Board to exercise its discretion in a manner befitting an ERISA fiduciary. Instead, the Board, like the Committee before it, turned a blind eye to all medical evidence supporting disability. Refusing to conduct a medical review of any kind, the Board denied Mr. Ashmore's appeal based on the same, unwarranted reason – that Mr. Ashmore refused to attend three medical examinations without providing at least two business days advance notice to the Plan Office. [Ashmore 811-813].

Notably, the Board, as part of its appeal review, had the authority and opportunity to schedule Mr. Ashmore for medical examinations. [Ashmore 12]. It did not do so. Had Defendant truly been unable to make a proper benefits decision without a medical examination, then sending Mr. Ashmore to a medical examination on appeal would have been the reasonable and sensible thing to do. Clearly, the Board was uninterested in acting in a reasonable manner.

Instead, the Board seemed content to simply rubberstamp the Committee's denial of Mr. Ashmore's application for T&P disability benefits.[13] Indeed, the Board was so brazen in its unreasonableness, it admits that it never conducted any sort of medical review whatsoever. [Ex. A - *Def.'s Resp. to Pl.'s Req. for Admis.*, *No. 5;* Ex. C - *Def.'s Resp. to Pl.'s Req. for Produc.*, *Nos. 8 & 20*]. So, the <u>hundreds</u> of pages of medical records Mr. Ashmore submitted from the initiation

---

[13] Interestingly, the record reflects that the Board was presented with a case summary. This summary is not dated, nor does it indicate who authored the summary. This summary contains inaccuracies and reeks of bias. Of significance, the summary contained a bullet point list of all medical records submitted with a statement that "[t]he records contain no findings that Player is T&P." Given that Defendant has never conducted a medical review of any sort, nor reached a conclusion as to whether Mr. Ashmore was in fact disabled, this statement is perplexing and purposefully misleading.

of his claim through the appeal were never considered by the Board. Such action, or lack thereof, begs the question whether there was any way to satisfy the Board. It would appear that no matter what Mr. Ashmore submitted with his appeal, the Committee, and the Board after it, would have summarily ignored that information.

Despite being the named fiduciary under the Plan, the Board cannot claim it acted as a fiduciary. The Board ignored all evidence of Mr. Ashmore's T&P disability and disregarded all evidence of unreasonable behavior by the Committee by endorsing the initial ambush of a denial. This was a clear violation of ERISA and the Plan's full and fair review requirement.

### C.  Had Defendant Bothered to Look, It Would Have Found Substantial Evidence of Disability

The fact is, Mr. Ashmore has submitted extensive proof of his T&P disability throughout the application and appeal process. Had the Plan ever fairly reviewed the evidence, it would have realized it already had clear evidence of T&P disability. Because Defendant acted callously and opportunistically, it missed the substantial evidence of T&P disability it had before it all along.

The Plan defines T&P disability as being "(1) substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, and, (2) your condition is permanent." [Ashmore 11]. Notably, Defendant has admitted that applications for T&P disability benefits *can* be approved without conducting medical evaluations. [Ex. A - *Def.'s Resp. to Pl.'s Req. for Admis.*, *No. 2*]. Despite this fact, and despite the significance of medical proof of disability to an application for disability benefits, Defendant never conducted a medical review of Mr. Ashmore's file. Defendant instead insisted on in-person medical examinations by physicians chosen by Defendant without ever considering whether the evidence Mr. Ashmore had submitted already proved his disability.

22

Aware of Defendant's desire for medical examinations, Mr. Ashmore's appeal included overwhelming medical evidence of disability. In May of 2016, Mr. Ashmore underwent a comprehensive rehabilitation evaluation with Dr. Craig Lichtblau,[14] whose evaluation and report consisted of: (i) an independent medical evaluation; (ii) medical records review; (iii) medical functional capacity assessment; (iv) medical functional capacity opinion; (v) AMA impairment rating; (vi) functional assessment; (vii) summary report; and (viii) photographs of Mr. Ashmore. [Ashmore 620-789].

Dr. Lichtblau concluded that Mr. Ashmore is "unable to maintain gainful employment." [Ashmore 642]. He noted Mr. Ashmore "lives a sedentary lifestyle due to chronic pain nearly from head to toe. He suffers from migraine headaches, confusion, depression, and had multiple orthopedic issues in almost every joint of his body." [Ashmore 638]. Further, the doctor confirmed Mr. Ashmore can be expected to experience "acute, intermittent exacerbations of chronic pain and discomfort," and is restricted to sitting for a mere 15-20 minutes and standing for 5-8 minutes. [Ashmore 642].

This report is precisely the type of medical evaluation Defendant insisted it needed after Mr. Ashmore submitted his application for benefits. And yet, Defendant never reviewed this report or had it reviewed by a physician consultant. While insisting on medical examinations in Georgia, Defendant had before it a comprehensive medical evaluation with substantial documentation of ongoing T&P disability. Defendant ignored it.

---

[14] Notably, Dr. Craig Lichtblau is located in Mr. Ashmore's home state of Florida – the state Defendant insisted it was impossible to arrange for medical evaluations in when Mr. Ashmore's doctor recommended Mr. Ashmore not travel out of state.

In addition to this report, Mr. Ashmore submitted hundreds of pages of medical records *all* in support of his T&P disability. Indeed, the medical records depict a gradual and continuous breakdown in Mr. Ashmore's *physical* and *mental* state over time.

In a report prepared by Dr. Conidi, dated April 26, 2016, the doctor acknowledged that Mr. Ashmore suffers from debilitating pain that is exacerbated by "prolonged standing, bending, lifting." [Ashmore 418]. According to Dr. Conidi, epidural injections failed to alleviate Mr. Ashmore's pain. [Id]. He concluded that "as a result of both his cervical and lumbar pain with associated radicular symptoms, Mr. Ashmore will have significant difficulties participating in any type of consistent and gainful employment, even in a sedentary type of environment, as the prolonged sitting will worsen the aforementioned symptoms."[15][Id]. Further, "Mr. Ashmore's memory issues and chronic migraine headaches are severe enough" to preclude his ability to "hold down and continuous and gainful employment." [Ashmore 419].

Objective medical evidence corroborates the opinion of Dr. Conidi. MRIs revealed bulging discs in his lumbar and cervical spine, which led to diagnoses of intervertebral disc disorder and cervical radiculopathy. [Ashmore 443-455].

Mr. Ashmore also suffers from debilitating pain in both knees. For this pain, he treats with Gary Richman, M.D., and Marc Matarazzo, M.D. His knee-related diagnoses, as confirmed by X-rays and MRIs, include, but are not limited to, unilateral primary osteoarthritis in both knees, severe left patellofemoral OA with synovitis, and chronic ACL insufficiency. [Ashmore 431-439; Ashmore 499-450, Ashmore 589-592].

---

[15] In his progress notes, Dr. Conidi has also opined that Mr. Ashmore's "need for medications to control his pain in conjunction with his history of repetitive head trauma makes it extremely unlikely that he will be able to gain or maintain any gainful employment." [Ashmore 587].

Due to Mr. Ashmore's ongoing and unrelenting pain, Mr. Ashmore frequently receives chiropractic manipulation from Dr. David Rudnick, who treats him for "episodic exacerbations of chronic neck pain, right cervical radiculopathy, bilateral shoulder girdle pain, low back pain and bilateral knee pain." [Ashmore 440]. In fact, Dr. Rudnick has noted a "steady decline in Mr. Ashmore's tolerance to physical activity and ADL's." [Id]. To further complicate matters, Mr. Ashmore treats with multiple cardiologists for hypertension and hypertensive heart disease. [Ashmore 188-196, Ashmore 148-155, Ashmore 532-571].

In addition to physical impairments and restrictions, Mr. Ashmore suffers from cognitive impairments. He experiences memory loss, speech difficulties, and an inability to maintain attention/concentration. Objective medical evidence corroborates Mr. Ashmore's poor cognitive function. This includes the results of: (i) an independent neurological evaluation; (ii) an MRI of the brain with DTI; (iii) a QEEG interpretation; and, (iv) a psychological report.

Of note, the MRI of the brain with DTI revealed abnormal white matter FA – which has been correlated with cognitive deficits in traumatic brain injury patients. [Ashmore 607-608]. The QEEG interpretation also indicated "a significant elevation of fontal [sic], central and occipital beta power, indicative of regional brain dysfunction (encephalopathy) likely related to frequent headaches." [Ashmore 613]. The psychological evaluation completed by Dr. Williams and Dr. Hopper noted borderline or extremely low performance in (i) verbal comprehension (2nd percentile); (ii) perceptual reasoning (5th percentile); (iii) working memory (3rd percentile); and, (iv) processing speed (<0.1 percentile). [Ashmore 422]. Thus, Mr. Ashmore was diagnosed with a major neurocognitive disorder. [Ashmore 429].

It is important to note that the aforementioned records represent only a small portion of the close to 550 pages of medical records submitted by Mr. Ashmore. The totality of the medical

records make clear that Mr. Ashmore is, beyond any reasonable contention, totally disabled under the Plan.

Against this evidentiary backdrop, Defendant should have approved Mr. Ashmore's application without insisting on medical examinations. This is not a situation in which a former player has not received consistent medical treatment and therefore has no medical records to submit with his application for T&P disability benefits. On the contrary, this is a situation in which Defendant has willfully closed its eyes to uncontroverted evidence that Mr. Ashmore is unable to engage in any gainful employment. Indeed, Defendant blatantly admitted that it did not have Mr. Ashmore's medical records reviewed by a medical professional during the application or appeal process. [Ex. A - *Def.'s Resp. to Pl.'s Req. for Admis.*, No. 5] Such refusal to review medical documentation is a prima facie violation of ERISA's requirements of a full and fair review and the plain language of the Plan itself. 29 U.S.C. § 1133(2) (2009); [Ashmore 54].

In addition, based on its own Plan language, the Committee and Board are required to "discharge their duties with respect to the Plan solely in the interest of the Player. . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man. . . would use in the conduct of an enterprise of like character and with like aims." [Ashmore 43-44]. Defendant failed in that regard. Rather, Defendant seems to have deliberately and intentionally ignored the medical records and instead, just parroted the false assertion that Mr. Ashmore violated the plan provision pertaining to medical examinations. To do so was unreasonable.

## V.   CONCLUSION

Defendant failed to reasonably execute its duty to perform a full and fair review. Instead, it revealed its self-interest every step of the way by ambushing Mr. Ashmore with a denial, ignoring

substantial evidence of disability, and failing to take any of several opportunities to overturn its decision upon appeal.

WHEREFORE, Plaintiff, Darryl Ashmore, respectfully requests that this Court grant summary judgment in his favor, awarding his past-due monthly T&P disability benefits from the date he filed his application – September 25, 2015, through present, including interest, and further grant him an award of attorney's fees and costs.

## VI.    REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.01(j), Plaintiff, Darryl Ashmore, respectfully requests oral argument on his Motion for Summary Judgment and Incorporated Memorandum of Law. Given that the great majority of ERISA benefits decisions are disposed of on motions for summary judgment, it is not likely a bench trial will be required. The Court's decision-making process would be significantly aided by oral argument, as the Court would have an opportunity to obtain clarification of issues of fact in the record and ask questions regarding legal issues raised. Plaintiff estimates a total of two (2) hours will be necessary for argument.

*Respectfully submitted this 30th day of October, 2017,*

*/s/ Edward Philip Dabdoub*
Edward Philip Dabdoub (FBN 45685)
eddie@longtermdisability.net
Kevin Schaefer (FBN 123688)
kevin@longtermdisability.net
DABDOUB LAW FIRM, P.A.
1600 Ponce de Leon Blvd, Suite 1205
Coral Gables, Florida 33134
Tel: (305) 754-2000
Fax: (305) 754-2007
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing Motion with the Clerk of

Court by using the CM/ECF system, which will, in turn, send a notice of electronic filing to

Defendant's attorneys:

Michael Junk, *pro hac vice*
mjunk@groom.com
Groom Law Group, Chartered
1701 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 861-5430
Fax: (202) 659-4503

Brian D. Equi (FBN 143936)
BEqui@goldbergsegalla.com
Goldberg Segalla
800 North Magnolia Avenue, Suite 1201
Orlando, FL 32803
Tel: (407) 458-5600
Fax: (407) 458-5699


*/s/ Edward P. Dabdoub*
Edward P. Dabdoub